JUDGE BATTS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CIV 5755

| | | |
|---|---|---|
| RR DONNELLEY FINANCIAL, INC., a Delaware Corporation, RRD FINANCIAL OF NEW YORK CITY, L.L.C., a New York L.L.C., | ) ) ) ) ) | Case No |
| Plaintiffs, | ) ) ) | VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF |
| vs. | ) ) ) | |
| ROBERT J. MUELLER, an individual, and MERRILL CORPORATION, a Minnesota Corporation, | ) ) ) ) | |
| Defendants. | | |

**RRD'S COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND OTHER RELIEF**

Plaintiffs RR Donnelley Financial, Inc. (f/k/a Bowne & Co., Inc.) and RRD Financial of New York City, L.L.C. (f/k/a Bowne of New York City, L.L.C.) (collectively "RRD"), by and through their undersigned attorneys, bring this Complaint for Permanent Injunctive and Other Relief against Defendants Robert J. Mueller ("Mueller") and Merrill Corporation ("Merrill") (collectively, "Defendants"). For its Complaint, RRD alleges as follows:

**PARTIES**

1.    RR Donnelley Financial, Inc. is a Delaware corporation with its principal place of business located in New York, New York. RR Donnelley Financial, Inc. is, therefore, a citizen of Delaware and New York under 28 U.S.C. § 1332(c)(1) for purposes of determining citizenship in a diversity action.

2.    RRD Financial of New York City, L.L.C. is a limited liability company with its principal place of business located in New York, New York. RRD Financial of New York City,

L.L.C.'s sole member is RR Donnelley Financial, Inc., making it a citizen of Delaware and New York under 28 U.S.C. § 1332(c)(1) for purposes of determining citizenship in a diversity action.

3.    RR Donnelley Financial, Inc. (f/k/a Bowne & Co., Inc.) and RRD Financial of New York City, L.L.C. (f/k/a Bowne of New York City, L.L.C.) are wholly owned subsidiaries of RR Donnelley & Sons Company ("RR Donnelley"). RR Donnelley is the world's premier full-service provider of integrated communications services. Founded more than 146 years ago, RR Donnelley, through subsidiaries like RRD, works collaboratively with more than 60,000 customers worldwide to develop custom communications solutions that reduce costs, enhance return on investment, and ensure compliance. Drawing on a range of proprietary and commercially available digital and conventional technologies deployed across four continents, the company employs a suite of leading Internet-based capabilities and other resources to provide premedia, printing, logistics and business process outsourcing services to leading clients in virtually every private and public sector.

4.    Merrill is a Minnesota corporation with its principal place of business located in St. Paul, Minnesota. Merrill is a citizen of Minnesota under 28 U.S.C. § 1332(c)(1) for purposes of determining citizenship in a diversity action.

5.    Merrill is also a global provider of integrated communications services and is a direct competitor to RRD.

6.    Mueller is an individual and a resident of Califon, New Jersey. Mueller is a citizen of New Jersey under 28 U.S.C. § 1332(c)(1) for purposes of determining citizenship in a diversity action.

7.    Until very recently, Mueller was a Senior Vice President in sales at RRD. Upon information and belief, up until a few days ago Mueller had immediate plans to accept

employment with Merrill where he would have performed the same or similar sales duties as he performed for RRD.

## JURISDICTION AND VENUE

8.      Jurisdiction over this action is conferred on this Court by 28 U.S.C. 1332(a) in that the matter in controversy exceeds the sum of value of $75,000 and is between citizens of different States.

9.      The United States District Court for the Southern District of New York is the proper venue pursuant to 28 U.S.C. §1391(a).

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

10.      RRD and Merrill are direct competitors in providing global integrated communications services.

11.      Until his termination for cause effective August 16, 2011, Mueller worked for RRD as a Senior Vice President of sales out of RRD's New York City office. Until his termination, Mueller had worked continuously for RR Donnelley Financial, Inc., formerly known as Bowne & Co., since June 1, 1992.

12.      The global integrated communications industry is a relationship-driven business. Because customer relationships and knowledge of customer needs is such a primary part of RRD's business, RRD devotes substantial resources to developing its customer relationships and to training its sales personnel to build, cultivate and nurture these relationships. To this end, in addition to providing generous guaranteed salaries, RRD provides its sales professionals with an ample annual budget to entertain and socialize with RRD clients. In Mueller's case, RRD paid more than $500,000 in expenses over Mueller's last five years of employment, in addition to other company-paid client events such as sporting and concert tickets, to help him build and strengthen his RRD client relationships. In addition, RRD maintains a robust sales training

-3-

program where new employees learn RRD's confidential operations and techniques. Employees also receive ongoing training throughout their careers at RRD, and RRD expends resources to make sure its employees are kept current on all the latest technical developments and product information.

13.     In February 2010, RR Donnelley announced that it would purchase Bowne & Co. and its wholly owned subsidiary, Bowne of New York City, L.L.C. RR Donnelley began the acquisition process shortly thereafter, and completed its purchase on November 24, 2010 for a total of $481 million. Around this time, Bowne & Co., Inc. changed its name to RR Donnelley Financial, Inc. and Bowne of New York City, L.L.C. changed its name to RRD Financial of New York City, L.L.C. RRD Financial of New York City, L.L.C. remains a wholly-owned subsidiary of RR Donnelley Financial, Inc.

14.     A substantial portion of the value, indeed the primary value, RR Donnelley paid for in this acquisition was the Bowne &Co. customer relationships and goodwill maintained by the Bowne sales force, including Defendant Mueller.

15.     In the fall of 2010, Merrill began a campaign of aggressively soliciting and recruiting RRD employees. Since the summer of 2010, Merrill has hired approximately 18 former RRD employees. As a result of Merrill's aggressive recruiting, Merrill is fully aware of the employment contracts signed by Mueller and other RRD employees.

**Mueller's Confidentiality Agreement**

16.     RRD protects its investment in its key employees like Mueller through employment agreements that contain restrictions on employees' employment and post-employment activities.

17.     On January 30, 2006, Mueller entered into a five-year Master Employment Agreement with R.R. Donnelley Financial, Inc. (f/k/a Bowne & Co.). In consideration of, among

-4-

other things, a guaranteed minimum annual salary of $225,000, a $50,000 signing bonus, and other generous benefits, Mueller agreed to maintain and preserve RRD's confidential information and to refrain from unfairly competing with RRD in a variety of ways. Several of these covenants were memorialized in the Agreement Regarding Confidentiality, Intellectual Property and Non-Solicitation of Employees (hereinafter, "Confidentiality Agreement") between Mueller and Bowne. A true and accurate copy of the Confidentiality Agreement is attached hereto as Exhibit A and by its reference is incorporated herein.

18.     The Confidentiality Agreement includes at Paragraph 1 a Full Time Employment Provision which prohibited Mueller from "engag[ing] in any employment or activity other than for Bowne in any business in which Bowne is or becomes engaged."

19.     The Confidentiality Agreement further provides at Paragraphs 4 and 5 that, during and for five years after his employment with Bowne (or such time which Bowne has made the Confidential Information at issue public), Mueller is prohibited from "(a) disclos[ing] directly or indirectly, any Confidential Information to anyone outside of Bowne...or (b) us[ing] any Confidential Information other than as may be necessary to perform [his] duties at Bowne," and that Mueller is particularly prohibited from "disclos[ing] any Confidential Information to, or us[ing] any Confidential Information for the benefit of, any current or future competitor, supplier or customer of Bowne, whether [him]self, any subsequent employer, or any other person, company or entity."

20.     In Paragraph 2 of the Confidentiality Agreement, Mueller acknowledged that his "position with Bowne creates a relationship of high trust and confidence with respect to Confidential Information proprietary to Bowne, its customers or suppliers that may be learned or developed by [him] while employed at Bowne."

21. Paragraph 2 of the Confidentiality Agreement defines "Confidential Information" as all information which (a) "has not been made available generally to the public either by Bowne or by a third party with Bowne's consent," (b) "is useful or of value to Bowne's current or anticipated business activities or those of a customer or supplier of Bowne," or "has been identified as confidential to [Mueller] by Bowne (orally or in writing) or…has been maintained as confidential from outside parties and is reasonably recognizable as intended for internal disclosure only."

22. Paragraph 3 of the Confidentiality Agreement provides examples of Confidential Information including, *inter alia,* pricing, nonpublic financial information, current and prospective customer lists and information on customers.

23. At Paragraph 10 of the Confidentiality Agreement, Mueller acknowledges that "violation of the foregoing confidentiality or non-solicitation obligations will cause Bowne irreparable harm," and that, as a result, Bowne is entitled to injunctive relief, in addition to any and all other remedies available to it under law.

24. Mueller further acknowledges at Paragraph 19 that the Confidentiality Agreement is executed on behalf of Bowne and each of its subsidiaries and affiliates, and that his obligations under the Confidentiality Agreement apply equally to each of Bowne's subsidiaries and affiliates, which may enforce the Agreement in their own names as if they were parties.

25. Finally, Mueller agrees at Paragraph 22 of the Confidentiality Agreement that he will pay to Bowne the costs and reasonable attorneys' fees and expenses incurred by Bowne in the event it prevails in enforcing any or all of the terms of the Agreement.

## Mueller's Noncompetition and Nonsolicitation Agreement

26. On January 30, 2006, in consideration of, among other things, a guaranteed minimum annual salary of $225,000, a $50,000 signing bonus, and other generous benefits,

06267-0045/LEGAL21542941.2

Mueller also signed an Agreement Regarding Employment. A true and accurate copy of the Agreement Regarding Employment is attached hereto as Exhibit B and by its reference is incorporated herein.

27.     In the Agreement Regarding Employment, Mueller acknowledges the "special and unique" relationship with Bowne customers, "based on the development and maintenance of good will resulting from the customers' contacts with Bowne's sales representatives including [him]self."

28.     Mueller further acknowledges that "as a result of [his] sales position and customer contacts... [he will possess] valuable information about Bowne's relationship with its customers and potential customers, their buying habits, special needs, purchasing policies and other matters which [he] would not otherwise know and which is not readily available, all of which information is proprietary to Bowne."

29.     As such, the Agreement Regarding Employment provides at Paragraph 1 that if Mueller resigns without "Good Reason" or is terminated for "Cause," he:

> "will not for a period of one (1) year following [his] termination, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, in a geographic area within a fifty (50) mile radius of the Bowne office from which [he] is principally working at the date of such termination, engage in any business which is competitive with the financial and legal printing business of Bowne."

(Hereinafter referred to as "Noncompetition Agreement.")

30.     Mueller was terminated for "Cause" effective August 16, 2011.

31.     The Agreement Regarding Employment also provides at Paragraph 2 that if Mueller resigns without "Good Reason" or is terminated for "Cause," he:

> "will not for a period of one (1) year following [his] termination, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, solicit or assist any

06267-0045/LEGAL21542941.2

customer or customers or clients, or individuals who worked for a customer or client... who, during the two (2) years immediately preceding [his] termination, had been assigned to [him] by Bowen, or any customer or customers which [he] had contacted on behalf of Bowne for sales purposes while an employee of Bowne; or disclose to any person, company or entity of any kind the names or addresses of any such customer or customers; or directly or indirectly in any way request, suggest or advise any such customer or customers to withdraw or cancel any of their business or refuse to continue to do business with Bowne."

(Hereinafter referred to as "Nonsolicitation Agreement.")

32.     At Paragraph 4 of the Agreement Regarding Employment, Mueller acknowledges that "the special and unique nature of the customer relationship and Bowne's interest therein..." entitles Bowne to injunctive relief to enforce the Agreement, in addition to any and all other remedies available to it under law.

33.     Finally, Mueller agrees at Paragraph 5 of the Agreement Regarding Employment that he will pay to Bowne the costs and reasonable attorneys' fees and expenses incurred by Bowne in the event it prevails in enforcing any or all of the terms of the Agreement.

### Customer Relationships, Employee Interests, and Business Interests

34.     At all times relevant to this action, Mueller was subject to a Confidentiality Agreement (attached hereto as Exhibit A) in which he agreed that it was his duty and obligation to preserve and protect RRD's confidential information during and after his employment.

35.     RRD has developed its confidential information over a significant period of time and at great expense. This information is not known outside of RRD and is valuable because of its secrecy.

36.     RRD has protected the secrecy of its confidential information through several means, including but not limited to: (a) requiring employees to sign agreements containing confidentiality provisions; (b) discussing confidentiality policies with its employees at the time of hire; (c) requiring key employees, like Mueller, to sign post-employment restrictive

covenants; (d) limiting access to confidential information and monitoring who is given access to such information; (e) password protecting all computers; (f) instructing personnel not to disclose confidential information to persons outside of RRD both during and after their employment; (g) prohibiting the disclosure of confidential information in employment policies; (h) requiring all confidentiality and proprietary materials to be returned whenever an employee terminates his or her employment; (i) requiring the execution of non-disclosure agreements prior to the distribution of relevant, limited information to it customers; (j) programming computer systems to lock automatically if they remain idle for more than a few minutes; and (k) restricting employee access to corporate customers' account databases.

## Mueller's Access to Confidential Information

37.     During the course of his employment with RRD, Mueller was entrusted with and had access to a variety of confidential business information, including statements of work, service calculators, product cost information, sales and margin information, other cost information, customer sales history, customer price quotes, purchasing manners and methods, the identity and addresses of actual or potential customers, and financial data. RRD has invested substantial amounts in designing, developing, improving and protecting its confidential information.

38.     Mueller managed all aspects of RRD's relationships with dozens of customers. In this capacity, Mueller devised pricing and margin strategies, negotiated sales, set prices, and had other responsibilities that required the use of RRD's confidential information. Because of his position, Mueller was given access to customer account information that contained confidential business information, including printing cost formulas, sales and margin data, pricing and margins. RRD's competitors could use this information to RRD's disadvantage if they had

access to it because it is not disclosed to customers and is not known to others in the industry who could benefit by using it.

39.     Because Mueller promised to protect and preserve confidential information, RRD entrusted this information to him with the explicit understanding that he would at all times keep it secret and use it only for the benefit of RRD.

**Mueller, in Collaboration with Merrill, Begins Misappropriating RRD's Confidential Information, Soliciting RRD's Customers, and Usurping RRD's Corporate Opportunities for the Benefit of Himself and of Merrill While Still Employed at RRD.**

40.     Beginning in or around June 2011 and continuing to the present, Mueller, in collaboration with Merrill and in preparation for his employment with Merrill, began a campaign of misappropriation of RRD's confidential information, including, but not limited to forwarding to his personal email account, contact lists of RRD customers, RRD offering circulars and proposals, and invoices. Mueller was at all times able to remotely and securely access this information through the RRD computer network and through RRD's corporate gmail account and there was thus no legitimate business reason for him to forward RRD's confidential information to his personal email account.

41.     On August 5, 2011, Mueller forwarded himself two proofs for an offering circular and a proposal for an offering memorandum, which are clearly labeled "Confidential" and contain extensive confidential information pertaining to RRD pricing and RRD's customer needs.

42.     On August 10, 2011, Mueller forwarded himself an invoice for a project that will have follow-up business associated with it. The information on this invoice would be useful for a competitor seeking to take over this work.

-10-

43.    Around the same time and continuing to the present, Mueller, in collaboration with Merrill and in preparation for his employment with Merrill, began soliciting current and prospective RRD customers to discontinue doing business with RRD in favor of Merrill.

44.    More than half of Mueller's annual sales come from RRD clients in Australia. Over his career, RRD has funded approximately 10 Mueller sales trips to Australia to build up this client base at an average cost of approximately $20,000 per sales trip. In late July 2011, Mueller told RRD that he was taking a family vacation to the New Jersey shore. This was a lie. While RRD believed Mueller was vacationing at the beach with his family, Mueller was instead on a secret, 12-day sales trip to Sidney, Melbourne, and Perth, Australia. During this trip in July 2011, Mueller met with his key RRD clients in order to facilitate his attempts to transfer their business from RRD to Merrill. When he returned, Mueller told his supervisors and co-workers that he had spent a relaxing time at the beach with his family.

45.    On or around July 2011, Mueller also solicited one of his biggest RRD clients to transfer its business from RRD to Merrill. Specifically, on July 26, 2011, a Merrill employee wrote the RRD client to thank him for "the new business." The client then forwarded the Merrill email to Mueller, stating *"Bob, FYI. I assume you will get credit for this."* Over the previous five years, that client had given Merrill only two small projects, worth only a few hundred dollars, while RRD had done the vast majority of the client's work. However, once Mueller directed the client to Merrill in or about July 2011, the client suddenly sent Merrill work worth several hundred thousand dollars. As with the Australia trip, Mueller lied to cover his activities. A few days later a colleague asked Mueller who had gotten the client's business. Mueller told his co-worker that it was at another printer but that he did not know who.  If this account moves

-11-

permanently to Merrill, RRD will lose several hundred thousand dollars per year in sales revenue.

46.     At all times relevant, Merrill was aware of Mueller's Confidentiality Agreement and his Agreement Regarding Employment.

47.     Upon information and belief, Merrill encouraged or directed Mueller to use RRD's confidential information and trade secret information to divert RRD sales and sales

48.     In encouraging or directing Mueller to contact and solicit RRD's customers, Merrill has willfully interfered with RRD's business relationships with these customers.

## CLAIMS FOR RELIEF

### Count I
### (Against Mueller for Breach of the Confidentiality Agreement)

49.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 49 of the Complaint.

50.     The Confidentiality Agreement is a valid and enforceable contract.

51.     The Confidentiality Agreement prohibits Mueller from engaging in any activity other than for RRD in which RRD is engaged.

52.     The Confidentiality Agreement prohibits Mueller from disclosing RRD's confidential information to anyone outside of RRD, and particularly for the benefit of RRD's competitors.

53.     RRD provided Mueller sufficient consideration to support the Confidentiality Agreement.

54.     At all relevant times, RRD complied with the Confidentiality Agreement.

-12-

55.     Mueller has breached and is continuing to breach the Confidentiality Agreement by, *inter alia,* using and disclosing RRD's proprietary and confidential information for the benefit of himself and Merrill.

56.     As a direct and proximate result of Mueller's conduct, RRD has suffered and continues to suffer immediate and irreparable injury for which there is no adequate remedy at law. RRD is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Mueller is enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury to Mueller.

## Count II
### (Against Mueller for Breach of the Noncompetition Agreement)

57.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 57 of the Complaint.

58.     The Noncompetition Agreement is a valid and enforceable contract.

59.     The Noncompetition Agreement is reasonable in duration and geographic scope and is reasonably necessary to protect RRD's legitimate protectable interest in prohibiting the exploitation and disclosure of its Confidential Information, and to protect the special and unique relationship RRD has with its customers.

60.     RRD provided Mueller sufficient consideration to support the Noncompetition Agreement

61.     At all relevant times, RRD complied with the Noncompetition Agreement.

62.     Under the Noncompetition Agreement, Mueller agreed not to engage in business with any RRD competitor within a fifty (50) mile radius of the RRD office from which he principally worked for a period of one (1) year following his termination.

-13-

63.     Upon information and belief, Mueller is threatening to compete for his former RRD accounts with Merrill or another competitor located in New York City. As such, Mueller is threatening to breach the Noncompetition Agreement.

64.     As a direct and proximate result of Mueller's conduct, if Mueller is not enjoined, RRD will suffer immediate and irreparable injury for which there is no adequate remedy at law. RRD is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Mueller is enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury to Mueller.

### Count III
### (Against Mueller for Breach of the Nonsolicitation Agreement)

65.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 65 of the Complaint.

66.     The Nonsolicitation Agreement is a valid and enforceable contract.

67.     The Nonsolicitation Agreement is reasonable in duration and geographic scope and is reasonably necessary to protect RRD's legitimate protectable interest in prohibiting the exploitation and disclosure of its Confidential Information, and to protect the special and unique relationship RRD has with its customers.

68.     As a Senior Vice President, Mueller developed a special and unique relationship with RRD customers. RRD invested in Mueller and provided a platform from which to foster, nurture, and cultivate the RRD goodwill reflected in Mueller's customer contracts and relationships.

06267-0045/LEGAL21542941.2

69.     Mueller's employment positioned him to obtain specialized knowledge regarding the specific needs and wants of RRD's customers, RRD's pricing of products and services, RRD's costs, and the profit margins RRD earned on certain products.

70.     RRD provided Mueller sufficient consideration to support the Nonsolicitation Agreement

71.     At all relevant times, RRD performed its obligations under the Nonsolicitation Agreement.

72.     Under the Nonsolicitation Agreement, Mueller agreed, for a period of one (1) year following his termination, not to solicit or disclose customers assigned to Mueller by RRD or contacted by Mueller on behalf of RRD, or suggest or advise such customers to refrain from doing business with RRD.

73.     Upon information and belief, Mueller has and continues to solicit and disclose such customers to Merrill and to suggest that such customers refrain from doing business with RRD. As such, Mueller is threatening to breach the Nonsolicitation Agreement.

74.     As a direct and proximate result of Mueller's conduct, if Mueller is not enjoined, RRD will suffer immediate and irreparable injury for which there is no adequate remedy at law. RRD is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Mueller is enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury to Mueller.

## Count IV
### (Against Mueller for Breach of Loyalty and Fiduciary Duties)

75.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 75 of the Complaint.

06267-0045/LEGAL21542941.2

76.     As a RRD Senior Vice President, Mueller had knowledge and responsibilities such that they may be used to harm RRD.

77.     Mueller owed RRD a duty of loyalty and fiduciary duties.

78.     Mueller breached his duty of loyalty and fiduciary duties to RRD by, among other things, diverting and actively attempting to shift RRD business and sales opportunities to Merrill, and by disclosing RRD's confidential information, all while still employed by RRD.

79.     Mueller's breach of his duty of loyalty and fiduciary duties was willful and wanton toward the rights of RRD.

80.     As a direct and proximate result of Mueller's conduct, RRD has suffered and continues to suffer immediate and irreparable injury for which there is no adequate remedy at law. RRD is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Mueller is enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury to Mueller.

<u>Count V</u>
**(Against Mueller for Misappropriation of Corporate Opportunities)**

81.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 81 of the Complaint.

82.     Mueller owed RRD a duty of loyalty and fiduciary duties, including the duty to refrain from diverting RR's corporate opportunities.

83.     RRD had a tangible expectancy of business from its customers which Mueller, while still employed at RRD, diverted and exploited for his own benefit and for the benefit of Merrill.

06267-0045/LEGAL21542941.2

84.     Mueller's breach of these duties was willful and wanton toward the rights of RRD.

85.     As a direct and proximate result of Mueller's conduct, RRD has suffered and continues to suffer immediate and irreparable injury for which there is no adequate remedy at law. RRD is threatened with losing money, customers, goodwill, confidential information and income in amounts that may be difficult to determine, unless Mueller is enjoined and restrained by Order of this Court. Further, the benefits of granting injunctive relief outweigh any possible injury to Mueller.

<u>Count VI</u>
**(Against Merrill and Mueller for Conspiracy to Commit Breach of Loyalty and Fiduciary Duties)**

86.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 86 of the Complaint.

87.     Mueller owed RRD a duty of loyalty and fiduciary duties.

88.     As a fiduciary, Mueller was required to act with utmost good faith and fidelity toward RRD, and was prohibited from actively exploiting his position with RRD for his own benefit, or the benefit of another.

89.     Mueller breached his duty of loyalty and fiduciary duties to RRD by, among other things, diverting and actively attempting to shift RRD business and sales opportunities to Merrill, and by disclosing RRD's confidential information, all while still employed by RRD.

90.     Merrill conspired with and had a meeting of the minds with Mueller, with the objective to improperly compete with RRD and/or facilitate Mueller's breach of his fiduciary duties to RRD.

06267-0045/LEGAL21542941.2

91.     As a direct and proximate result of Merrill's and Mueller's conduct, RRD has suffered and continues to suffer immediate and irreparable injury, and the loss of money, customers, goodwill, confidential information and income.

## Count VII
### (Against Merrill and Mueller for Tortious Interference with RRD's Economic Relations with Its Customers)

92.     RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 92 of the Complaint.

93.     RRD has valuable economic relationships with its customers.

94.     At all relevant times, Merrill and Mueller had knowledge of RRD's valuable relationships with its customers.

95.     Without justification, Merrill and Mueller intentionally, wrongfully and illegally interfered with RRD's valuable relationships with its customers.

96.     In interfering with these relationships, Merrill and Mueller engaged in illegal or improper conduct, including but not limited to inducing and/or conspiring to convert RRD confidential information.

97.     RRD has suffered injuries as a direct and proximate result of Merrill's and Mueller's tortious interference with RRD's relationships with its customers.

98.     Merrill's and Mueller's tortious interference with RRD's customer relationships has caused, and unless enjoined, will continue to cause, substantial harm and irreparable injury for which RRD has no adequate remedy at law.

99.     Merrill's and Mueller's conduct, as alleged herein, constitutes malicious, oppressive, willful and wanton tortious behavior in blatant and reckless disregard of RRD's

06267-0045/LEGAL21542941.2

rights, for which RRD should recover punitive damages in an amount sufficient to deter Merrill and Mueller and others similarly situated from engaging in future similar conduct.

## Count VIII
### (Against Merrill and Mueller for Unfair Competition)

100.   RRD realleges and incorporates by reference the allegations contained in paragraphs 1 through 100 of the Complaint.

101.   By their wrongful conduct, Merrill and Mueller misappropriated RRD's confidential information through an abuse of fiduciary and confidential duties and/or via fraudulent or improper means.

102.   As a result of Merrill and Mueller's wrongful conduct, RRD was deprived of its due profits.

103.   Merrill and Mueller undertook the foregoing acts with knowledge of and disregard for RRD's rights, and with the intention of causing harm to RRD and benefiting Merrill and Mueller.

104.   Merrill and Mueller are unfairly competing with RRD by means of the use of RRD's confidential information.

105.   Merrill's and Mueller's unfair competition has caused, and unless enjoined, will continue to cause, substantial harm and irreparable injury for which RRD has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, RRD respectfully requests that the Court award RRD the following relief against Defendants:

A.   Permanently enjoining, ordering, and restraining Mueller from:

06267-0045/LEGAL21542941.2

1.  Contacting, soliciting or providing products or services to RRD's current, prospective or former customers for a period of 12 months from the date of the injunction;

2.  Using or disclosing RRD's Confidential Information for a period of five (5) years from the date of the injunction; and

3.  Being employed by, or engaging in business with Merrill or any other RRD competitors within a 50 mile radius of New York, New York, for a period of 12 months from the date of the injunction;

B.  Permanently enjoining, ordering, and restraining Defendants from:

1.  Disclosing or using RRD's confidential information, and proprietary business information and documents;

2.  Unfairly competing with RRD in any manner whatsoever; and

3.  Contacting or soliciting the RRD customers with whom Mueller called on while at RRD for 12 months.

C.  Ordering Defendants to return all materials that relate to any of RRD's confidential information, and intellectual property;

D.  Ordering Defendant Mueller to disgorge all compensation paid to him by RRD during his periods of disloyalty;

E.  Awarding RRD compensatory damages;

F.  Awarding RRD punitive damages;

G.  Awarding RRD its costs;

H.  Awarding RRD its reasonable attorneys' fees; and

I.  Granting such other and further relief as may be just and proper.

Dated:  August 17, 2011

By: /s/ *[signature]*

MARK RISK, P.C.
Mark Risk (mdr 5823)
60 East 42nd Street, Suite 4700
New York, New York 10165
Telephone: 212-682-4100
Facsimile: 212-682-4775
Email: mdr@mrisklaw.com

PERKINS COIE LLP
Craig T. Boggs*
Jeannil D. Boji*
131 S. Dearborn, Suite 1700
Chicago, Illinois 60603
Telephone: 312-324-8400
Facsimile: 312-324-9400
Email:    cboggs@perkinscoie.com
Email:    jboji@perkinscoie.com

Attorneys for Plaintiffs

06267-0045/LEGAL21542941.2

## VERIFICATION

I, John Batt, do hereby affirm, under the penalties for perjury, that the facts alleged in the foregoing Verified Complaint for Injunctive and Other Relief are true to the best of my knowledge, information and belief.

John Batt
Managing Director
R.R. Donnelley Financial, L.L.C.

MITCHELL GOLDSMITH
Notary Public, State of New York
No. 01GO6002905
Qualified in New York County
Commission Expires Feb. 17, 2014

06267-0045/LEGAL21542941.2

-22-

# EXHIBIT A

# BOWNE

<u>Robert Mueller</u>
(Print name of employee)                                                                      <u>Exhibit A</u>

## AGREEMENT REGARDING CONFIDENTIALITY, INTELLECTUAL PROPERTY AND NON-SOLICITATION OF EMPLOYEES

In consideration of my employment or continued employment by Bowne & Co., Inc. or any subsidiary, affiliate, successor or assignee thereof (collectively, "Bowne"), and the compensation paid to me from time to time by Bowne, I agree as follows:

1. *Full Time Employment.* While employed by Bowne, I will devote my entire skill, full and undivided attention and best efforts to the duties and responsibilities that are assigned to me from time to time, and I will not, without Bowne's prior written consent, engage in any employment or activity other than for Bowne in any business in which Bowne is or becomes engaged.

2. *Definition of Confidential Information.* I realize that my position with Bowne creates a relationship of high trust and confidence with respect to Confidential Information proprietary to Bowne, its customers or suppliers that may be learned or developed by me while employed by Bowne. For purposes of this Agreement, "Confidential Information" shall mean all information that meets one or more of the following conditions: (a) it has not been made available generally to the public either by Bowne or by a third party with Bowne's prior written consent, (b) it is useful or of value to Bowne's current or anticipated business activities or those of a customer or supplier of Bowne, or (c) it either has been identified as confidential to me by Bowne (orally or in writing) or it has been maintained as confidential from outside parties and is reasonably recognizable as intended for internal disclosure only.

3. *Examples of Confidential Information.* Confidential Information includes, but is not limited to: computer or data processing programs, electronic data processing applications, computer code, source code, object code, interface code, documentation and instructions, unpatented inventions, discoveries or improvements; marketing, manufacturing, organizational, research and development, and business plans; company policies; sales forecasts; personnel information (including the identity of Bowne employees, their responsibilities, competence and abilities, and compensation); medical, health or personally identifiable information about employees; pricing and nonpublic financial information; current and prospective customers lists and information on customers or their employees; information concerning planned or pending acquisitions or divestitures; and information concerning purchases of major equipment or property.

1

**EXHIBIT 1**

4. *Confidentiality Obligations.* During and after my employment with Bowne, I will not (a) disclose, directly or indirectly, any Confidential Information to anyone outside of Bowne or to any employees of Bowne not authorized to receive such information, or (b) use any Confidential Information other than as may be necessary to perform my duties at Bowne. In no event will I disclose any Confidential Information to, or use any Confidential Information for the benefit of, any current or future competitor, supplier or customer of Bowne, whether myself, any subsequent employer, or any other person, company or entity.

5. *Duration.* With respect to Confidential Information my obligation under paragraph 4 shall continue until the earlier to occur of the following: (a) five (5) years has elapsed since termination of my employment with Bowne for any reason, including termination by Bowne with or without cause, or (b) the Proprietary Information has been made available generally to the public either by Bowne or by a third party with Bowne's prior written consent.

6. *Geographic Scope.* I understand that Bowne has sales and manufacturing facilities throughout the world, and that it purchases equipment, materials, products and services from suppliers located throughout the world. I therefore agree that my obligations under paragraph 4 shall extend worldwide.

7. *Former Employers.* I acknowledge that Bowne expects me to respect and safeguard the trade secrets and confidential information of my former employers. I will not disclose to Bowne, use in Bowne's business, or cause Bowne to use, any information or material that is confidential to any former employer, unless such information is no longer confidential or Bowne or I have obtained the written consent of such former employer to do so.

8. *Return of Property.* Upon termination of my employment with Bowne, I will return all Bowne property in my possession, including notebooks, reports, manuals, programming data, listings and materials, drawings, patent applications, any other documents, files or materials which contain, mention or relate to Confidential Information, and all copies and summaries of such materials, that I may have or that may come into my custody while employed by Bowne.

9. *Non-Solicitation of Bowne Employees.* I shall not while employed by Bowne and for a period of two (2) years from the date of termination of my employment with Bowne for any reason including termination by Bowne with or without cause, either directly or indirectly solicit, induce or encourage any Bowne employee(s) to terminate their employment with Bowne or to accept employment with any competitor, supplier or customers of Bowne, nor shall I cooperate with any others in doing or attempting to do so. As used herein, the term "solicit, induce or encourage" includes, but is not limited to, (a) initiating communications with a Bowne employee relating to possible employment, (b) offering payments, compensation or any other item of value to encourage or assist Bowne employees to terminate their employment with Bowne and accept employment with a competitor, supplier or customer of Bowne, or (c) referring

2

or directing Bowne employees to personnel or agents employed or engaged by competitors, suppliers or customers of Bowne.

10. *Injunctive Relief.* I acknowledge that violation of the foregoing confidentiality or non-solicitation obligations will cause Bowne irreparable harm. I agree that Bowne is entitled to protection from such violations, including protection by injunctive relief, in addition to, and not in substitution for, any and all other remedies available to it under law.

11. *Disclosure of Developments.* I will disclosed promptly to Bowne all inventions, discoveries, developments, improvements, works of authorship and computer programs and related documentation (collectively, "Developments") that are made, conceived, first reduced to practice or learned by me either solely or jointly with another or others while employed by Bowne, whether or not they are patentable, copyrightable or subject to trade secret protection.

12. *Ownership of Developments.* I agree that, except as otherwise provided in paragraph 16, hereof, all Developments shall be the sole and exclusive property of Bowne. Any Development for which copyrights protection is available shall be considered a work make for hire or, if I am an independent contractor, assigned by me to Bowne. I agree to assign and do hereby assign to Bowne, or to some other legal entity ("Assignee") designated by Bowne, all of my right, title and interest in and to all Developments.

13. *Protection of Developments.* Bowne or Assignee shall have the right to use the Developments and obtain Letters Patent, copyrights (as author or assignee) or other statutory or common law protections for Developments in all countries. I will provide Bowne or assignee such assistance as may be requested in order for Bowne or its assignee to obtain or otherwise secure, and from time to time enforce, U.S. or foreign Letters Patent, copyrights or other statutory or common law protections for Developments, including the execution of any and all documents that Bowne or its assignee may wish to use to obtain or otherwise secure or enforce such rights, together with any assignments thereof to Bowne or its assignee, and to the successors and assigns of Bowne or its assignee, transferring all of my right, title and interest in and to any Development, and the right to apply for or otherwise obtain any such rights. Bowne or its assignee shall have the sole right to determine what actions, if any, to take wish respect to any Development. All costs and expenses incurred in obtaining and enforcing rights in Developments owned by or assigned to Bowne shall be borne by Bowne.

14. *Post-Employment Assistance.* If I am no longer employed by Bowne, Bowne or its assignee shall compensate me at a reasonable rate for time actually spent by me at the request of Bowne or its assignee on the assistance referred to in paragraph 13. Such rate shall be determined by Bowne and shall be based on my compensation at the time my employment with Bowne was terminated. Bowne or its assignee shall also

3

reimburse me for pre-approved out-of-pocket expenses which may be incurred in complying with such request.

15. *Employee Inventions.* I understand that the provisions of paragraphs 12, 13 and 14 of this Agreement do not apply to an invention for which none of Bowne's equipment, supplies, facilities or proprietary information was used and which was developed entirely on my own time, unless the invention relates directly to Bowne's business or to Bowne's actual or anticipated research or development activities, or unless the invention results from work I perform for Bowne.

16. *Pre-Existing Developments.* I have identified at the end of this Agreement all Developments that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my employment with Bowne, and that I desire to exclude from operation of this Agreement. If there are no Developments listed, I represent that I have made no such Developments.

17. *Payments.* With respect to any Development for which Bowne seeks to obtain U.S. or foreign letters patent Bowne will pay me the sum of One Thousand Dollars ($1,000) when I execute an assignment of the Development to Bowne, or when I execute the first patent application and assignment covering the Development, whichever occurs first. Divisional or continuation-in-part applications shall be considered to cover separate Developments. The payment of such sum of One Thousand Dollars ($1,000) shall relieve Bowne of any obligation to make any further payments to me with respect to such Developments. If there are several co-inventors, this sum shall be divided equally between them.

18. *Identification of Authorship.* Bowne, its assignees and licensees are not required to designate me as the author of any design, computer program or related documentation or other work of authorship created as a work made for hire or assigned under this Agreement when any such work is distributed publicly, nor to make any such public distribution.

19. *Subsidiaries and Affiliates.* I understand and agree that this Agreement is executed by on behalf of Bowne & Co., Inc. and each of its subsidiaries and affiliates, that my obligations under this Agreement shall apply equally to each of Bowne's subsidiaries and affiliates and that such subsidiaries and affiliates may enforce this Agreement in their own names as if they were parties to this Agreement.

20. *Prior Agreements.* The provisions of any previous agreement relating to the same subject matter shall remain in effect with respect to any Developments disclosed by me to Bowne prior to the date of this Agreement. Any Development made or conceived during the term of such previous agreement but not disclosed until after the date of this Agreement shall be governed by the terms of this Agreement.

21. *Severability.* If any part of this Agreement is held by a court to be void or unenforceable for any reason, the remaining provisions of this Agreement shall

4

continue in full force and effect. If a court is of the opinion that any part of this Agreement is unreasonable or unenforceable, it may modify this Agreement to make it reasonable and enforceable in all respects.

22. *Recovery of Expenses.* I agree to pay to Bowne the costs and reasonable attorneys' fees and expenses incurred by Bowne in the event it prevails in enforcing any or all of the terms of this Agreement.

23. *No Guaranteed Employment.* Nothing herein contained shall be construed to require Bowne to employ me for any stated period of time.

24. *Survival of Obligations.* The provisions of paragraphs 2-15, 17, 18, and 21-25 of this Agreement shall survive its termination.

25. *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of New York as applied to agreements executed in and to be fully performed within said state.

Name: _____
        Robert Mueller

Date: _____
        January 30, 2006

Bowne of New York City, L.L.C.

By: _____

Name: William Lee

Title: President

5

The following are Developments (see paragraph 16 above), in which I have any right, title or interest, and which were conceived or written either wholly or in part by me prior to my employment with Bowne.

DESCRIPTION OF DOCUMENTS (if applicable)

| Title of Document | Date of Document | Name of Witness on Document |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

6

# BOWNE

Robert Mueller
(Print name of employee)

## MASTER EMPLOYMENT AGREEMENT

This Master Employment Agreement ("Agreement") is made and entered into as of the date set forth on the attached Exhibits and with the specific terms set forth on each individual Exhibit between the employee whose name and home address are set forth on the attached Exhibit (the "Eligible Employee") and Bowne of New York City, L.L.C., 345 Hudson Street, New York, NY 10014 ("Company").

### WITNESSETH:

**WHEREAS,** the Company believes that each Eligible Employee either has made or will make a significant contribution in developing and maintaining its financial and legal printing business and desires the Eligible Employee to become or remain a sales representative of the Company by offering the Eligible Employee a term employment;

**WHEREAS,** the Company desires to employ or continue to employ the Eligible Employee, and the Eligible Employee desires to continue as a sales representative in the Company's financial and legal printing business to serve accounts located primarily within the territory set forth in the attached Exhibit;

**NOW, THEREFORE,** in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Eligible Employee hereby agree as follows:

1. **DEFINITIONS** See Sales Compensation Policies effective April 1, 2003, revised April 7, 2003 (collectively, the "Sales Compensation Plan") for additional definitions.

   **Exhibit.** The term "Exhibit" refers to Exhibit A and B to this Agreement and additional attachments including, without limitation, the attachment relating to each specific Eligible Employee.

   **Market Locations.** The A Market Locations are: New York, Chicago, Metropolitan Los Angeles, Metropolitan San Francisco, Dallas and Houston. The B Market Locations are: all locations not included in the A Market Location designation. Bowne Financial Print Management shall have the right to designate or redesignate Market Locations at any time and from time to time.

1

**Four-Year Period:** means the four-year period prior to the effective date of the Exhibit measured from January 1 to December 31.

**Eligible Employee.** In order to be able to participate in this Agreement, a sales representative must meet all of the following criteria, unless Financial Print Management, in its discretion, waives any one or all of these requirements (Financial Print Management's signing of the Eligible Employee's Exhibit acts as such a waiver of any criteria not met by the Eligible Employee), and thereby becomes a Eligible Employee:

i.   Be a participant in the Sales Compensation Plan for at least four (4) years, or have equivalent experience in the financial and legal printing industry;

ii.  Have minimum aggregate Collected Contribution in A Market Locations during the Four-Year Period of either (a) or (b) below:
     (a) $4,000,000 (Four Million Dollars) of annual Credited Sales per year in each one of three (3) of the past four (4) years, or (b) $1,500,000 (One Million Five Hundred Thousand Dollars) in annual Collected Contribution per year in each of three (3) of the past four (4) years, **OR**
     Have minimum aggregate Collected Contributions in B Market Locations during the Four-Year Period of either (a) or (b) below:
     (a) $3,000,000 (Three Million Dollars) of annual Credited Sales per year in each one of three (3) of the past four (4) years, or (b) $1,000,000 (One Million Dollars) in annual Collected Contribution per year in each of three (3) of the past four (4) years, or

iii. Demonstrate an ability to sell a variety of Bowne services and products;

iv.  Meet an acceptable competency level in (a) securing work for the Company, including assisting in its production, invoicing and collecting for the services or products the Company offers; (b) understanding core technologies and product offerings (e.g. BowneLink®, BowneFile16™, 8K Express™), demonstrating appropriate office and general business conduct and perspective, demonstrating appropriate communication skills with management, colleagues, customers, and other Bowne employees, supporting and managing diversity, and training other sales representatives when requested; and (c) meeting other criteria and core competencies that may be established by Financial Print Management from time to time; and

v.   Be selected, in Financial Print Management's discretion, to participate in this Agreement.

2.  **EMPLOYMENT; TERM OF EMPLOYMENT.** The Company hereby agrees to employ the Eligible Employee, and the Eligible Employee hereby agrees to be

2

employed by the Company, upon the terms and conditions set forth herein and on the Exhibit(s) attached. The term of the Eligible Employee's employment hereunder shall begin and end as set forth on the attached Exhibit ("Term"). If the Term ends and the Eligible Employee has not executed a new Exhibit to this Agreement, but remains an employee of the Company, the Eligible Employee will be covered by the terms of the Sales Commission Plan and Exhibits A and B only until he or she and the Company execute a new, mutually acceptable Exhibit.

3.  **PERFORMANCE OF SERVICES.** As a sales representative, the Eligible Employee shall have and continue to have the responsibility and authority to (i) provide services of the type customarily provided by sales representatives with respect to providing financial and legal printing services, to the Company's existing customers whose accounts are assigned to the Eligible Employee, (ii) provide such customary services with respect to offering and promoting the Company's financial and legal printing services to prospective customers, and (iii) perform such other duties as are usually attendant to the performance of the foregoing services primarily within the territory set forth in the attached Exhibit. For the purposes of this Agreement, financial and legal printing services shall mean services provided in connection with printing (i) registration statements, proxies, official statements, private placement statements, private placement memoranda and other documents required under the rules and regulations of the Securities and Exchange Commission and other regulatory bodies (collectively, the "SEC"); and (ii) annual reports, and other financial and legal documents not required under the rules and regulations of the SEC. During the Term of his or her employment hereunder, the Eligible Employee shall (i) perform faithfully the responsibilities assigned to him or her hereunder to the best of his or her ability at no less a level as Bowne generally requires of its sales representatives; (ii) devote his or her entire skill, full and undivided business time, other than during vacations taken in accordance with the Company's established policies, and best efforts to the performance of such duties and responsibilities and others that may be assigned to the Eligible Employee from time to time; and (iii) not engage, without the prior written consent of the Company in its discretion, in any other employment or business activities, other than personal investment activities, including, but not limited to, the trading of securities and the development of real estate opportunities, consistent with the written policies of the Company. Nothing contained above or otherwise in this Agreement or any of the Exhibits shall prevent the Company from (a) reasonably supervising the manner of performance of such responsibilities by the Eligible Employee, or (b) assigning or reassigning all or a portion of existing or prospective customer accounts/individual contacts, either to or from the Eligible Employee at any time or from time to time by the Company in its sole discretion.

4.  **EXCLUSIVITY OF SERVICE; CONFIDENTIAL INFORMATION.** The Eligible Employee has either concurrently with the execution of this Agreement or previously signed the agreement entitled Confidentiality, Intellectual Property and Non-Solicitation of Employees, in the form attached hereto as Exhibit A, and

3

the agreement entitled Agreement Regarding Employment, in the form attached hereto as Exhibit B, and the contents thereof are hereby made part of this Agreement and will survive the termination of this Agreement for any reason, including, without limitation, termination as the result of a breach by either party.

5.   **COMPENSATION.**  As compensation for services rendered during the Term of his or her employment hereunder, the Company shall pay to the Eligible Employee a minimum amount of annual compensation during the Term set forth in the Exhibit (the "Annualized Rate").  The Eligible Employee's annual draw during the Term is also set forth in the Exhibit.  The Company will look at each quarter's commissions and make a quarterly payment to the Eligible Employee when the Eligible Employee's annualized commissions fall below the Annualized Rate (each, a "Make-Up Payment", collectively, "Make-Up Payments").   If the Company has made Make-Up Payments to the Eligible Employee and the Eligible Employee's Commissions in the same year or the next two years exceed the Annualized Rate, the Company will reduce the Eligible Employee's commissions by an amount not to exceed such Make-Up Payments, but in no event will the reduction of commissions bring the Eligible Employee below the Annualized Rate.

The Eligible Employee's draw and commission will be in accordance with the Bowne sales commission policies under the Sales Compensation Plan which may be changed by Bowne from time to time in its sole discretion.

6.   **FRINGE BENEFITS.**  The Eligible Employee also shall be entitled to take time off for vacation or illness in accordance with the Company's policies as they apply to sales representatives and to participate in all other employee benefit plans and receive all other fringe benefits which are from time to time made generally available to sales representatives, unless the terms of those plans or other understandings or agreements make the Eligible Employee ineligible for participation.

7.   **EXPENSE REIMBURSEMENT.**  The Company shall reimburse the Eligible Employee for all proper and documented expenses incurred by him or her in the performance of his or her responsibilities hereunder in accordance with the policies and procedures of the Company in effect from time to time.

8.   **TERMINATION OF EMPLOYMENT.**

   (a)  This Agreement may be terminated by the Company for Cause (defined below).  If the Eligible Employees employment is terminated for Cause, any payments set forth in this Agreement and Exhibits shall be payable only up to the date of termination.  For purposes of this Agreement and the Exhibits, the term "Cause" shall mean:

4

    i. The Eligible Employee commits a material breach of this Agreement or any of the Exhibits; or

    ii. The Eligible Employee misappropriates Company funds or engages in any act of fraud or dishonesty in connection with his or her employment; or

    iii. The Eligible Employee refuses to perform, deliberately disregards Company policy or rules or is repeatedly negligent in performing his or her duties and under this Agreement; or

    iv. The Eligible Employee violates the Company's Code of Ethics, Stock Trading policy, Non-Harassment Policy or Drug-Free Workplace Policy; or

    v. The Eligible Employee dies; or

    vi. The Eligible Employee is disabled (which disability would qualify for long term disability under the Company's then current long term disability plan), rendering the Eligible Employee unable to perform his or her duties under this Agreement for a period in excess of six months.

(b) This Agreement may be terminated by the Eligible Employee for Good Reason (defined below). For purposes of this Agreement and the Exhibits, the term "Cause" shall mean a material breach by the Company of this Agreement or any of the Exhibits.

(c) Notwithstanding anything above in this Section 8 or otherwise in this Agreement or Exhibit to the contrary, neither the Eligible Employee nor the Company shall have the right to terminate this Agreement unless and until the other party shall have been given a written notice of the grounds for termination in reasonable detail and the party seeking to terminate this Agreement shall have failed to correct the basis for termination within ten (10) days of receiving such notice. No such right to correct the grounds for termination shall be available to the Eligible Employee or the Company and the notice of termination shall be effective immediately upon delivery if the grounds for termination set forth in the notice are not reasonably correctable within such ten (10) day period.

(d) Notwithstanding anything in this Agreement or the Exhibits to the contrary, Exhibit A and B shall survive termination of this Agreement.

(e) The Company and the Eligible Employee agree to begin discussions for a new agreement four (4) months prior to the expiration of the Term, but neither party shall be obligated to continue such discussions or to enter into a new agreement.

9. **ASSIGNABILITY.** The obligations of the Eligible Employee hereunder are personal and may not be assigned or transferred by him or her in any manner whatsoever. This Agreement may not be assigned by the Company, except that

this Agreement may be assigned by the Company to any parent, subsidiary or affiliate of the Company or any person, company or entity which succeeds to the business of the Company if the obligations of the Company hereunder are expressly assumed by and shall be binding upon the assignee or successor and the assignee or successor is or will then be engaged in the business of providing financial and legal printing services (as defined in Section 3).

10. **NOTICE.** Any notice or request required or permitted to be given hereunder shall be deemed to have been properly given if it is given in writing and is delivered personally or sent by registered mail, return receipt request, to the addresses set forth in the Exhibit or to any other address designated by either of the parties by notice similarly given. If to the Company, such notice shall be directed to the attention of its President, with a copy to the Secretary of the Company.

11. **ENTIRE AGREEMENT.** This Agreement, including the Exhibit, Exhibit A and B attached hereto and any other Exhibits that may be executed hereto, contains the entire agreement between the Company and the Eligible Employee with respect to the subject matter contained herein. This Agreement may not be changed or terminated orally.

12. **APPLICABLE LAW.** This Agreement, including the Exhibits (notwithstanding the choice of law provisions in Exhibits A and B), shall at all times be governed by and construed in accordance with the internal laws (as opposed to the conflict of law provisions and decisions of)

(a) The State in which the Bowne office from which the Eligible Employee is principally working, or

(b) Regardless of the State that would be selected under 12(a) above, if the Exhibit outlining the Term and compensation sets forth an applicable law, then the State set forth in such Exhibit.

as applied to agreements executed in and to be fully performed within that State. The invalidity of any provision of this Agreement shall not affect the validity of any other provision of this Agreement. If a court is of the opinion that any part of this Agreement is unreasonable or unenforceable, it may modify this Agreement to make it reasonable and enforceable in all respects.

**IN WITNESS WHEREOF,** the Company has caused this Agreement to be signed on the attached Exhibit by its duly authorized officer and the Eligible Employee has signed the attached Exhibit as of the day and year set forth in the attached Exhibit.

# BOWNE

Robert Mueller
(Print name of employee)

EXHIBIT
TO
MASTER EMPLOYMENT AGREEMENT

1. Eligible Employee's Name: Robert Mueller

2. Eligible Employee's Home Address: P.O. Box 365, Oldwick, NJ 08858

3. Term: Five Years

4. Master Employment Agreement Sign-On and Stay Bonus: $50,000.00. This bonus shall be payable in cash to the Eligible Employee by the Company following the execution of this Agreement. If this Agreement is terminated by the Eligible Employee Without Good Reason or by the Company for Cause (other than the Eligible Employee's death or permanent disability), a portion of the Sign On and Stay Bonus shall be forfeited by the Eligible Employee. The amount of the forfeiture is the result of multiplying the amount of the Sign-On and Stay Bonus by a percentage, the numerator of which equals the number of days from the date of termination of this Agreement through and including the last day of the Term, and the denominator of which equals the number of days in the Term.

5. Deferred Sales Compensation: $20,000.00 per year for five years, payable under, and governed by the terms of the Deferred Sales Compensation Plan. Irrespective of the terms of the Plan, if this Agreement is terminated by the Eligible Employee Without Good Reason or by the Company for Cause (other than the Eligible Employee's death or permanent disability), a portion of the Employer Contributions under Section 3(c) of the Plan and investment growth thereon shall be forfeited by the Eligible Employee. The amount of the forfeiture is the result of multiplying such amounts by a percentage, the numerator of which equals the number of days from the date of termination of this Agreement through and including the last day of the Term, and the denominator of which equals the number of days in the Term.

6. Annualized Rate: $225,000.00 per year for five years

7. Draw: $98,000.00 per year

7

8.  Car Allowance: <u>$7,200.00</u> per year

9.  Club Dues: Bowne will pay 50% of your yearly club dues

10. Applicable Law: <u>New York</u>

11. Master Employment Agreement: The terms and conditions of the attached Master Employment Agreement are hereby incorporated into this Exhibit by reference as if the entire Agreement were restated herein. This Exhibit shall govern in case of any conflict with the Master Employment Agreement, Exhibit A or Exhibit B.

12. [Intentionally Omitted]

13. Amendment of Section 8(b) of the Master Employment Agreement: The word "Cause" is deleted and replaced with "Good Reason."

14. If the Eligible Employee has been in compliance with the terms of this Agreement during the term of this Agreement and at the end of the five year term a deficit exists, the Company will eliminate it.

Agreed to this 30 day of January, 2006

**BOWNE OF NEW YORK CITY, L.L.C.**

By: _William P. Lee_

Name: <u>William Lee</u>

Title: <u>President</u>

By: _Mueller_
   **ROBERT MUELLER**

8

# EXHIBIT B

# BOWNE

Robert Mueller
(Print name of employee)

## MASTER EMPLOYMENT AGREEMENT

This Master Employment Agreement ("Agreement") is made and entered into as of the date set forth on the attached Exhibits and with the specific terms set forth on each individual Exhibit between the employee whose name and home address are set forth on the attached Exhibit (the "Eligible Employee") and Bowne of New York City, L.L.C., 345 Hudson Street, New York, NY 10014 ("Company").

### WITNESSETH:

WHEREAS, the Company believes that each Eligible Employee either has made or will make a significant contribution in developing and maintaining its financial and legal printing business and desires the Eligible Employee to become or remain a sales representative of the Company by offering the Eligible Employee a term employment;

WHEREAS, the Company desires to employ or continue to employ the Eligible Employee, and the Eligible Employee desires to continue as a sales representative in the Company's financial and legal printing business to serve accounts located primarily within the territory set forth in the attached Exhibit;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Eligible Employee hereby agree as follows:

1. **DEFINITIONS**   See Sales Compensation Policies effective April 1, 2003, revised April 7, 2003 (collectively, the "Sales Compensation Plan") for additional definitions.

   **Exhibit.** The term "Exhibit" refers to Exhibit A and B to this Agreement and additional attachments including, without limitation, the attachment relating to each specific Eligible Employee.

   **Market Locations.** The A Market Locations are: New York, Chicago, Metropolitan Los Angeles, Metropolitan San Francisco, Dallas and Houston. The B Market Locations are: all locations not included in the A Market Location designation. Bowne Financial Print Management shall have the right to designate or redesignate Market Locations at any time and from time to time.

1

**EXHIBIT 2**

**Four-Year Period**: means the four-year period prior to the effective date of the Exhibit measured from January 1 to December 31.

**Eligible Employee.** In order to be able to participate in this Agreement, a sales representative must meet all of the following criteria, unless Financial Print Management, in its discretion, waives any one or all of these requirements (Financial Print Management's signing of the Eligible Employee's Exhibit acts as such a waiver of any criteria not met by the Eligible Employee), and thereby becomes a Eligible Employee:

   i.   Be a participant in the Sales Compensation Plan for at least four (4) years, or have equivalent experience in the financial and legal printing industry;

   ii.  Have minimum aggregate Collected Contribution in A Market Locations during the Four-Year Period of either (a)or (b) below:
        (a) $4,000,000 (Four Million Dollars) of annual Credited Sales per year in each one of three (3) of the past four (4) years, or (b) $1,500,000 (One Million Five Hundred Thousand Dollars) in annual Collected Contribution per year in each of three (3) of the past four (4) years, **OR**
        Have minimum aggregate Collected Contributions in B Market Locations during the Four-Year Period of either (a) or (b) below:
        (a) $3,000,000 (Three Million Dollars) of annual Credited Sales per year in each one of three (3) of the past four (4) years, or (b) $1,000,000 (One Million Dollars) in annual Collected Contribution per year in each of three (3) of the past four (4) years, or

   iii. Demonstrate an ability to sell a variety of Bowne services and products;

   iv.  Meet an acceptable competency level in (a) securing work for the Company, including assisting in its production, invoicing and collecting for the services or products the Company offers; (b) understanding core technologies and product offerings (e.g. BowneLink®, BowneFile16™, 8K Express™), demonstrating appropriate office and general business conduct and perspective, demonstrating appropriate communication skills with management, colleagues, customers, and other Bowne employees, supporting and managing diversity, and training other sales representatives when requested; and (c) meeting other criteria and core competencies that may be established by Financial Print Management from time to time; and

   v.   Be selected, in Financial Print Management's discretion, to participate in this Agreement.

2. **EMPLOYMENT; TERM OF EMPLOYMENT.** The Company hereby agrees to employ the Eligible Employee, and the Eligible Employee hereby agrees to be

2

employed by the Company, upon the terms and conditions set forth herein and on the Exhibit(s) attached.   The term of the Eligible Employee's employment hereunder shall begin and end as set forth on the attached Exhibit ("Term"). If the Term ends and the Eligible Employee has not executed a new Exhibit to this Agreement, but remains an employee of the Company, the Eligible Employee will be covered by the terms of the Sales Commission Plan and Exhibits A and B only until he or she and the Company execute a new, mutually acceptable Exhibit.

3.  **PERFORMANCE OF SERVICES.**  As a sales representative, the Eligible Employee shall have and continue to have the responsibility and authority to (i) provide services of the type customarily provided by sales representatives with respect to providing financial and legal printing services, to the Company's existing customers whose accounts are assigned to the Eligible Employee, (ii) provide such customary services with respect to offering and promoting the Company's financial and legal printing services to prospective customers, and (iii) perform such other duties as are usually attendant to the performance of the foregoing services primarily within the territory set forth in the attached Exhibit. For the purposes of this Agreement, financial and legal printing services shall mean services provided in connection with printing (i) registration statements, proxies, official statements, private placement statements, private placement memoranda and other documents required under the rules and regulations of the Securities and Exchange Commission and other regulatory bodies (collectively, the "SEC"); and (ii) annual reports, and other financial and legal documents not required under the rules and regulations of the SEC.  During the Term of his or her employment hereunder, the Eligible Employee shall (i) perform faithfully the responsibilities assigned to him or her hereunder to the best of his or her ability at no less a level as Bowne generally requires of its sales representatives; (ii) devote his or her entire skill, full and undivided business time, other than during vacations taken in accordance with the Company's established policies, and best efforts to the performance of such duties and responsibilities and others that may be assigned to the Eligible Employee from time to time; and (iii) not engage, without the prior written consent of the Company in its discretion, in any other employment or business activities, other than personal investment activities, including, but not limited to, the trading of securities and the development of real estate opportunities, consistent with the written policies of the Company. Nothing contained above or otherwise in this Agreement or any of the Exhibits shall prevent the Company from (a) reasonably supervising the manner of performance of such responsibilities by the Eligible Employee, or (b) assigning or reassigning all or a portion of existing or prospective customer accounts/individual contacts, either to or from the Eligible Employee at any time or from time to time by the Company in its sole discretion.

4.  **EXCLUSIVITY OF SERVICE; CONFIDENTIAL INFORMATION.**  The Eligible Employee has either concurrently with the execution of this Agreement or previously signed the agreement entitled Confidentiality, Intellectual Property and Non-Solicitation of Employees, in the form attached hereto as Exhibit A, and

3

the agreement entitled Agreement Regarding Employment, in the form attached hereto as Exhibit B, and the contents thereof are hereby made part of this Agreement and will survive the termination of this Agreement for any reason, including, without limitation, termination as the result of a breach by either party.

5. **COMPENSATION.** As compensation for services rendered during the Term of his or her employment hereunder, the Company shall pay to the Eligible Employee a minimum amount of annual compensation during the Term set forth in the Exhibit (the "Annualized Rate"). The Eligible Employee's annual draw during the Term is also set forth in the Exhibit. The Company will look at each quarter's commissions and make a quarterly payment to the Eligible Employee when the Eligible Employee's annualized commissions fall below the Annualized Rate (each, a "Make-Up Payment", collectively, "Make-Up Payments"). If the Company has made Make-Up Payments to the Eligible Employee and the Eligible Employee's Commissions in the same year or the next two years exceed the Annualized Rate, the Company will reduce the Eligible Employee's commissions by an amount not to exceed such Make-Up Payments, but in no event will the reduction of commissions bring the Eligible Employee below the Annualized Rate.

The Eligible Employee's draw and commission will be in accordance with the Bowne sales commission policies under the Sales Compensation Plan which may be changed by Bowne from time to time in its sole discretion.

6. **FRINGE BENEFITS.** The Eligible Employee also shall be entitled to take time off for vacation or illness in accordance with the Company's policies as they apply to sales representatives and to participate in all other employee benefit plans and receive all other fringe benefits which are from time to time made generally available to sales representatives, unless the terms of those plans or other understandings or agreements make the Eligible Employee ineligible for participation.

7. **EXPENSE REIMBURSEMENT.** The Company shall reimburse the Eligible Employee for all proper and documented expenses incurred by him or her in the performance of his or her responsibilities hereunder in accordance with the policies and procedures of the Company in effect from time to time.

8. **TERMINATION OF EMPLOYMENT.**

(a) This Agreement may be terminated by the Company for Cause (defined below). If the Eligible Employees employment is terminated for Cause, any payments set forth in this Agreement and Exhibits shall be payable only up to the date of termination. For purposes of this Agreement and the Exhibits, the term "Cause" shall mean:

4

i. The Eligible Employee commits a material breach of this Agreement or any of the Exhibits; or

ii. The Eligible Employee misappropriates Company funds or engages in any act of fraud or dishonesty in connection with his or her employment; or

iii. The Eligible Employee refuses to perform, deliberately disregards Company policy or rules or is repeatedly negligent in performing his or her duties and under this Agreement; or

iv. The Eligible Employee violates the Company's Code of Ethics, Stock Trading policy, Non-Harassment Policy or Drug-Free Workplace Policy; or

v. The Eligible Employee dies; or

vi. The Eligible Employee is disabled (which disability would qualify for long term disability under the Company's then current long term disability plan), rendering the Eligible Employee unable to perform his or her duties under this Agreement for a period in excess of six months.

(b) This Agreement may be terminated by the Eligible Employee for Good Reason (defined below). For purposes of this Agreement and the Exhibits, the term "Cause" shall mean a material breach by the Company of this Agreement or any of the Exhibits.

(c) Notwithstanding anything above in this Section 8 or otherwise in this Agreement or Exhibit to the contrary, neither the Eligible Employee nor the Company shall have the right to terminate this Agreement unless and until the other party shall have been given a written notice of the grounds for termination in reasonable detail and the party seeking to terminate this Agreement shall have failed to correct the basis for termination within ten (10) days of receiving such notice. No such right to correct the grounds for termination shall be available to the Eligible Employee or the Company and the notice of termination shall be effective immediately upon delivery if the grounds for termination set forth in the notice are not reasonably correctable within such ten (10) day period.

(d) Notwithstanding anything in this Agreement or the Exhibits to the contrary, Exhibit A and B shall survive termination of this Agreement.

(e) The Company and the Eligible Employee agree to begin discussions for a new agreement four (4) months prior to the expiration of the Term, but neither party shall be obligated to continue such discussions or to enter into a new agreement.

9. **ASSIGNABILITY.** The obligations of the Eligible Employee hereunder are personal and may not be assigned or transferred by him or her in any manner whatsoever. This Agreement may not be assigned by the Company, except that

5

this Agreement may be assigned by the Company to any parent, subsidiary or affiliate of the Company or any person, company or entity which succeeds to the business of the Company if the obligations of the Company hereunder are expressly assumed by and shall be binding upon the assignee or successor and the assignee or successor is or will then be engaged in the business of providing financial and legal printing services (as defined in Section 3).

10. **NOTICE.** Any notice or request required or permitted to be given hereunder shall be deemed to have been properly given if it is given in writing and is delivered personally or sent by registered mail, return receipt request, to the addresses set forth in the Exhibit or to any other address designated by either of the parties by notice similarly given. If to the Company, such notice shall be directed to the attention of its President, with a copy to the Secretary of the Company.

11. **ENTIRE AGREEMENT.** This Agreement, including the Exhibit, Exhibit A and B attached hereto and any other Exhibits that may be executed hereto, contains the entire agreement between the Company and the Eligible Employee with respect to the subject matter contained herein. This Agreement may not be changed or terminated orally.

12. **APPLICABLE LAW.** This Agreement, including the Exhibits (notwithstanding the choice of law provisions in Exhibits A and B), shall at all times be governed by and construed in accordance with the internal laws (as opposed to the conflict of law provisions and decisions of)

   (a) The State in which the Bowne office from which the Eligible Employee is principally working, or

   (b) Regardless of the State that would be selected under 12(a) above, if the Exhibit outlining the Term and compensation sets forth an applicable law, then the State set forth in such Exhibit,

as applied to agreements executed in and to be fully performed within that State. The invalidity of any provision of this Agreement shall not affect the validity of any other provision of this Agreement. If a court is of the opinion that any part of this Agreement is unreasonable or unenforceable, it may modify this Agreement to make it reasonable and enforceable in all respects.

   **IN WITNESS WHEREOF,** the Company has caused this Agreement to be signed on the attached Exhibit by its duly authorized officer and the Eligible Employee has signed the attached Exhibit as of the day and year set forth in the attached Exhibit.

6

# BOWNE

Robert Mueller
(Print name of employee)

### EXHIBIT
### TO
### MASTER EMPLOYMENT AGREEMENT

1. Eligible Employee's Name: Robert Mueller

2. Eligible Employee's Home Address: P.O. Box 365, Oldwick, NJ 08858

3. Term: Five Years

4. Master Employment Agreement Sign-On and Stay Bonus: $50,000.00.
   This bonus shall be payable in cash to the Eligible Employee by the Company following the execution of this Agreement. If this Agreement is terminated by the Eligible Employee Without Good Reason or by the Company for Cause (other than the Eligible Employee's death or permanent disability), a portion of the Sign On and Stay Bonus shall be forfeited by the Eligible Employee. The amount of the forfeiture is the result of multiplying the amount of the Sign-On and Stay Bonus by a percentage, the numerator of which equals the number of days from the date of termination of this Agreement through and including the last day of the Term, and the denominator of which equals the number of days in the Term.

5. Deferred Sales Compensation: $20,000.00 per year for five years, payable under, and governed by the terms of the Deferred Sales Compensation Plan. Irrespective of the terms of the Plan, if this Agreement is terminated by the Eligible Employee Without Good Reason or by the Company for Cause (other than the Eligible Employee's death or permanent disability), a portion of the Employer Contributions under Section 3(c) of the Plan and investment growth thereon shall be forfeited by the Eligible Employee. The amount of the forfeiture is the result of multiplying such amounts by a percentage, the numerator of which equals the number of days from the date of termination of this Agreement through and including the last day of the Term, and the denominator of which equals the number of days in the Term.

6. Annualized Rate: $225,000.00 per year for five years

7. Draw: $98,000.00 per year

7

8.  Car Allowance: <u>$7,200.00</u> per year

9.  Club Dues:  Bowne will pay 50% of your yearly club dues

10. Applicable Law: <u>New York</u>

11. Master Employment Agreement:  The terms and conditions of the attached Master Employment Agreement are hereby incorporated into this Exhibit by reference as if the entire Agreement were restated herein.  This Exhibit shall govern in case of any conflict with the Master Employment Agreement, Exhibit A or Exhibit B.

12. [Intentionally Omitted]

13. Amendment of Section 8(b) of the Master Employment Agreement:  The word "Cause" is deleted and replaced with "Good Reason."

14. If the Eligible Employee has been in compliance with the terms of this Agreement during the term of this Agreement and at the end of the five year term a deficit exists, the Company will eliminate it.

Agreed to this 3̲0̲ day of January, 2006

BOWNE OF NEW YORK CITY, L.L.C.

By: _____

Name: <u>William Lee</u>

Title: <u>President</u>

By: _____
    ROBERT MUELLER

# BOWNE

Robert Mueller
<u>(Print name of employee)</u>

Exhibit B

## AGREEMENT REGARDING EMPLOYMENT

You are to be employed by Bowne & Co., Inc., or its affiliates, subsidiaries successor or assignee thereof (collectively, "Bowne") as a sales representative dealing primarily with existing or prospective customers at Bowne in the financial and legal printing business. In this position you will have directed or assigned to you certain existing customers or potential customers of Bowne for the purpose of soliciting orders from and maintaining Bowne's good will with these customers.

As a member of our sales and service team, you receive and will continue to receive the benefits of Bowne's training, customer service contacts, account assignments, marketing programs, support services, production facilities, expense reimbursements and other substantial investments Bowne makes to develop and maintain the unique relationships between yourself and Bowne's customers on behalf of Bowne.

You recognize that Bowne's relationship with the customer or customers assigned to you, or upon whom you call, is special and unique, based upon the development and maintenance of good will resulting from the customers' contacts with Bowne's sales representatives including yourself. As a result of your sales position and customer contacts, you recognize that you have had and will continue to gain valuable information about Bowne's relationship with its customers and potential customers, their buying habits, special needs, purchasing policies and other matters which you would not otherwise know and which is not otherwise readily available, all of which information is proprietary to Bowne. Such knowledge is essential to the business of Bowne and you recognize that if your employment terminates, Bowne will be required to reestablish and reinforce each of those relationships in order that we may continue to meet the business needs of the customers. You acknowledge that during a period following your termination, Bowne is entitled to protection from your using the information and customer relationships with which you have been entrusted by Bowne during your employment and which would inevitably play a significant role were you to help a competitor of Bowne to solicit Bowne customers and potential customers.

In consideration of your employment, your compensation, the investment by Bowne in your training and your continuing employment by Bowne, you agree to the following terms and conditions relating to your employment:

1. If you choose to leave Bowne without Good Reason (as that term is defined in the Master Service Agreement), or if your employment with Bowne is terminated for Cause, you will not for a period of one (1) year following your termination, directly or indirectly, either as an employee, employer, consultant, agent,

1

principal, partner, corporate officer, director or in any other individual or representative capacity, in a geographic area within a fifty (50) mile radius of the Bowne office from which you are principally working at the date of such termination, engage in any business which is competitive with the financial and legal printing business of Bowne; and

2. If you choose to leave Bowne without Good Reason, or if your employment with Bowne is terminated for Cause, you will not for a period of one (1) year following your termination, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, solicit or assist any customer or customers or clients, or individuals who worked for a customer or client (such as, but not limited to, an outside attorney, investment banker or other professional advisor) who, during the two (2) years immediately preceding your termination, had been assigned to you by Bowne, or any customer or customers which you had contacted on behalf of Bowne for sales purposes while an employee of Bowne; or disclose to any person, company or entity of any kind the names or addresses of any such customer or customers; or directly or indirectly in any way request, suggest or advise any such customer or customers to withdraw or cancel any of their business or refuse to continue to do business with Bowne. This paragraph shall apply only where the customer is solicited to purchase a service or product that competes with the financial or legal printing services or products offered by Bowne.

3. Bowne, in its sole discretion may, in writing, release you from the obligations under Paragraph 1 and/or 2 above. If Bowne does not, within thirty (30) days from receiving a request for such release in writing from you, release you from the obligations under Paragraph 1 and/or 2 above, then Bowne shall pay you Two Thousand Dollars ($2,000) per month (less appropriate deductions) for each month Bowne does not so release you, up to a maximum of twelve (12) months following your termination. This amount shall be payable only if (a) all terms and conditions of the then applicable sales commission plan have been fully satisfied by you and all Bowne documents have been returned to Bowne by you, or (b) if you were not on a sales commission plan, all outstanding charges, reimbursed business expenses, advances, or other related matters are fully accounted for by you and resolved to Bowne's satisfaction, and all Bowne documents have been returned to Bowne by you.

4. The special and unique nature of the customer relationship and Bowne's interest therein, as recognized above, shall permit Bowne to enforce the protection afforded under this Agreement by injunctive relief, in addition to, and not as a substitute for, any and all other remedies available to it under the law.

5. You agree to pay to Bowne the costs and reasonable attorneys' fees and expenses incurred by Bowne in the event it prevails in enforcing any or all of the provisions of this Agreement.

6. This Agreement shall continue in full force and effect while you are employed at Bowne regardless of any change in your position or duties.

7. If any part of this Agreement is held by a court to be void or unenforceable, the remaining provisions of this Agreement shall continue in full force and effect. If

2

a court is of the opinion that any portion of this Agreement is unreasonable or unenforceable, it may modify this Agreement to make it reasonable and enforceable in all respects.

8. This Agreement shall be governed by and construed in accordance with the laws of the State of New York as applied to agreements executed in and to be fully performed within said state.

Name: _____
          Robert Mueller

Date: _____

Bowne of New York City, L.L.C.

By: _____

Name: William Lee

Title: President

3